ILLINI COUNTRY CLUB et al., Plaintiffs-Appellants, v. PROPERTY TAX APPEAL BOARD et al., Defendants-Appellees.

Fourth District    No. 4—93—0769

Argued April 12, 1994.—Opinion filed May 20, 1994.—Rehearing denied July 27, 1994.

GREEN, J., specially concurring.

Charles J. Gramlich (argued) and Michael J. Bland, both of Gramlich Law Offices, P.C., of Springfield, for appellants.

Roland W. Burris, Attorney General, of Chicago (Rosalyn B. Kaplan, Solicitor General, and Barbara E. Pitts, Assistant Attorney General (argued), of counsel), for appellee State of Illinois Property Tax Appeal Board.

Robert T. Lawley (argued), of Routman & Lawley, Ltd., of Springfield, for appellee Sangamon County Board of Review.

PRESIDING JUSTICE McCULLOUGH delivered the opinion of the court:

Plaintiffs Illini Country Club (Illini) and the Rail Golf Course,

Inc. (Rail), brought this administrative review action in the circuit court of Sangamon County against defendants State of Illinois Property Tax Appeal Board (IPTAB) and Sangamon County Board of Review (Board) for property tax relief. The circuit court affirmed the IPTAB decision, finding that both the IPTAB and the Board utilized the proper method of assessing the value of the golf courses pursuant to the "open space" valuation set forth in section 20g—1 of the Revenue Act of 1939 (Act) (Ill. Rev. Stat. 1991, ch. 120, par. 501g—1). Plaintiffs appealed.

The only issue raised by the plaintiffs is whether the decision of the IPTAB was against the manifest weight of the evidence because an improper method of valuation of open space was employed. However, the IPTAB challenges the jurisdiction of this court, and all lower tribunals, to consider the open space valuation of the subject properties because plaintiffs have failed to follow legislatively mandated procedures in raising the issue. Specifically, the IPTAB asks this court to consider whether there first must be approval by the county assessor to an application for open space valuation before a property owner can complain about the failure of a county to assess the property as open space. The IPTAB also suggests that the question of open space valuation was not properly raised before the Board because no application was filed with the Board by the plaintiffs. We affirm.

Both plaintiffs own private 18-hole golf courses located in Sangamon County. Illini is situated on three parcels of land totalling 130.659 acres. Rail is situated on one 150.54-acre parcel. The assessed valuations of the improvements to plaintiffs' properties are not at issue in this appeal. Plaintiffs contested their 1989 real estate property tax assessments and sought reductions. The Board denied the requested relief and assigned a value of $8,500 per acre to Illini ($1,110,062) and $6,000 per acre to Rail ($903,240). Plaintiffs appealed to the IPTAB, where the proceedings were consolidated and the evidence adduced at the hearing on Illini's property was incorporated into the record with regard to Rail's property.

At the hearing before the IPTAB, plaintiffs and the Board produced expert witnesses. Plaintiffs' expert witness was Ray High, a real estate appraiser. The Board's expert was "Gerald" Skilbeck, Sangamon County supervisor of assessments, also referred to as "Jerry" Skilbeck in the record.

High explained that any parcel of land qualifying as open space as defined by section 20g—1 of the Act should be assessed and taxed as open space regardless of how the land was actually used. Once the

property qualified for open space use, High concluded that differences in the soil type or grade of the land had no bearing on the value of property. In arriving at the open space value of the subject properties, High looked for land possessing characteristics of open land which did not have a higher and better use. High discovered 10 properties he considered reflective of open space use. For the most part, the comparable properties consisted of part tillable farmland, overflow land, timber, or pasture land, and had sale prices that ranged from $155 to $1,354 per acre. Eight of the ten properties were located in Sangamon County.

Sale number one contained 41.7 acres of which 30% of the tract was cropland with the remainder timberland. The property sold for $400 per acre in September 1988. Sale number two involved 97 acres of land which was overflow soil, prairie soil, and timber soils and which sold in March 1989 for $474 per acre. About 15% of that parcel was tilled at the time of sale. High had not checked the usages of these properties since the sales.

Tract three's 29.62 acres consisted of tillable overflow land which sold in January 1988 for $347 per acre. High testified that it was not being used as open space prior to the sale, and he did not testify to its use subsequent to the sale. Prior to the sale, it was farmed.

Tract four was an 85-acre parcel which sold in May 1988 for $82,000. Approximately 50% of tract four was tillable, with the rest pasture land. However, tract four contained the following improvements: a residence which rented for $350 per month, a metal-clad implement shed, a small crib, and a barn. According to High, the improvements and five acres could be sold for $50,000 leaving the remaining 80 acres valued at $406.25 per acre. Quite a bit of that land was in pasture and hay.

Sale number five involved the sale of 203.11 acres for $1,354 per acre in June 1988. Although this parcel contained the same soil types as on Illini's property, High stated that parcel five consisted of some of the best soil in the county and was not a good indication of open space soil. Land of this quality could be expected to be used as tilled land. According to High, the land was actually "too good" for open space.

Parcel six sold for $340 per acre in January 1989. Only 28% of the 261-acre farm was tillable with the remaining property considered overflow land. It contained gravel deposits, which would color the sale somewhat.

The 103 acres of tract seven sold in August 1989 for $340 per acre. Seventy-one percent of parcel seven was tillable. It was not presently used as open space land. The land was tilled.

Sale number nine comprised 220 acres of rolling brush land, timberland, and bottom timberland with five acres of tillable land. This property sold in August 1986 for $155 per acre at public auction.

Properties 8 and 10 were located in Christian County near Taylorville. Tract eight was similar to parcel one, but had a little smaller percentage of tillable land. This 53.45-acre parcel sold in August 1986 for $200 per acre at an auction. Sale number 10 was 54 acres of pasture land which sold for $206.86 per acre in March 1987.

Using the market approach, High concluded the three parcels held by Illini had an open space value of $450 per acre, whereas Rail's property had an open space value of $370 per acre. High determined the total open space value for Illini to be $58,796, and approximately $55,700 for Rail.

In preparing his study of comparables, High used no land sale comparables in Sangamon or Christian County that had been taxed as open space land. He did not recall seeing any. High arrived at his valuations by searching for sales of the least valuable land in the county, claiming land used for open space purposes would be land having the least value. High did not testify that any of the lands listed in his 10 comparable sales had any open space purpose as defined in section 20g—1 of the Act. High defined "open space" as "land that preserves nature, preserves growing things, that would be pleasing to the eye, trees, swamp, whatever." High did not consider farmland which was used for farming but subsequently sold for development into a golf course. He assumed such property would have a higher agricultural value. For example, if Illini were not a golf course, it would be highly unlikely to sell for open space. He rejected land with development possibilities.

All properties considered by Skilbeck were previously undeveloped farmlands purchased to be developed as a golf course. The sale prices of the comparable properties to which Skilbeck testified varied from $1,620 to $15,000 per acre. The majority of Skilbeck's comparable properties were located in McLean County, including three sales in Bloomington, Illinois, seven sales in Normal, Illinois, two purchases by the Bloomington-Normal Airport Authority, and one donation to the City of Bloomington.

Two of the fifteen sales of comparable properties used by Skilbeck were located in Sangamon County. The first Sangamon County property contained 184 acres and sold for $2,935 per acre. The second property contained 44.56 acres which sold for $5,947 per acre.

The first Bloomington parcel was a 119-acre tract located adjacent to Interstate 55 which sold for $2,346 per acre. The second Bloomington parcel was a 26.35-acre tract which sold for $5,000 per acre, and the third parcel was a 35.53-acre tract which sold for $4,503 per acre.

Of the seven parcels in Normal, the largest was a 250-acre tract which sold for $3,150 per acre and the smallest was a 27.4-acre tract which sold for $6,620 per acre. The other transactions in Normal were as follows: 54.8 acres for $6,626 per acre; 54.8 acres for $6,626 per acre; 82 acres for $3,150 per acre; 168 acres for $3,163 per acre; and 34 acres for $1,620 per acre. The two purchases by the Bloomington-Normal Airport Authority included one 70.32-acre tract of land which sold for $12,840 per acre and another 68.20-acre tract which sold for $10,592 per acre. The appraised value of the 16 acres of land donated to the City of Bloomington for use as a golf course was $15,000 per acre.

Skilbeck estimated that the open space value for the Illini property was $8,500 per acre. Skilbeck estimated the open space value of Rail's property to be $6,000 per acre. The difference in the value is because sales prices of property on the west side of Springfield were higher than those in the area of Rail.

Skilbeck conceded that if a person wanted to buy the property for a golf course, that person would have to pay the market price. Residential subdivisions and commercial developments could influence the market. In response to an inquiry from the Board's chairman, the Sangamon County State's Attorney's office did advise the Board that "[t]he current accepted method of valuation is to compare to other open spaces that have recently sold. That is, look to the selling price of some park, nature preserve, marsh, wetlands, etc., that have recently been sold."

The Board found the fair market value of Illini to be $1,489,105 and the fair market value of Rail to be $1,092,240. The Board's *assessed* valuation of Rail was $57,288 for the land alone after applying a 1.075 township multiplier. The Board, after application of a township multiplier of 1.065, assessed Illini $236,136 for its land on the three parcels ($17,129 plus $95,572 plus $123,435).

The IPTAB decision recognized that the subject properties qualified for open space classification under section 20g—1 of the Act. The majority of the IPTAB in this three-to-one decision found the range of comparables offered by the Board to be more indicative of open space value than the range offered by plaintiffs. The IPTAB noted that the Board did not argue that sales of existing golf courses were to be utilized as comparables, but that farmland purchased for an open space use, such as a golf course, was comparable. According to the IPTAB, the location of the subject properties mandated a higher value than $450 per acre. The IPTAB found that an open space value of between $8,000 and $10,000 per acre was more appropriate. The IPTAB also found, as Skilbeck had indicated, that

the subject properties' improvement assessments contained assessments for improvements such as tees, greens, and fairways which must be removed.

As far as the *assessed* valuation, the IPTAB found the Board to be incorrect. The open space assessment of the IPTAB for the land only of the subject properties was $348,470 for Illini ($22,883 plus $128,869 plus $196,718) and $401,490 for Rail. The lone dissenter would have reduced the assessed valuation to $19,599 for each plaintiff.

■ The first issue to consider is whether there were procedural irregularities which deprived this court of jurisdiction, particularly whether there first must be approval by the county assessor of an application for open space valuation before a property owner can complain about the failure of a county to assess the property as open space. The IPTAB states that the record does not disclose that the Sangamon County assessor had approved the subject property for open space classification. Section 20g—2 of the Act states:

> "The person liable for taxes on land used for open space purposes must file a verified application requesting the additional valuation provided for in Section 20g—1, with the county assessor of the county where the land is located, by January 1 of each year for which that valuation is desired. *** If the application shows the applicant is entitled to the valuation under Section 20g—1, the county assessor shall approve it; otherwise, he shall reject the application." (Ill. Rev. Stat. 1991, ch. 120, par. 501g—2.)

According to the IPTAB, unless the assessor approves the application for assessment of the subject property as open space, the landowner cannot seek open space valuation.

The supplement to the record contains plaintiffs' applications for open space valuation. Rail's application was filed on September 7, 1988. Illini's application was dated December 16, 1988, but no file date is stamped on the face of that application. However, the IPTAB's decision noted that plaintiffs' attorney represented that the applications were timely filed, and there does not seem to be any dispute as to the timeliness of the filing of the applications. Skilbeck testified before the IPTAB that the applications were not yet denied or approved and that the Sangamon County supervisor of assessments office and the Board were waiting for the outcome of these hearings. The hearing officer stated his understanding that the subject property qualified as open space as defined in section 20g—1 of the Act and that the only issue to be decided was the valuation to be placed on the open space. The IPTAB specifically found that the subject properties qualified for open space valuation under the statute.

The IPTAB recognizes that this issue was not considered earlier in this process. Issues not raised in the proceedings below cannot be raised for the first time on appeal. (*Shell Oil Co. v. Department of Revenue* (1983), 95 Ill. 2d 541, 550, 449 N.E.2d 65, 69; *Klubeck v. Division Medical X-Ray, Inc.* (1982), 108 Ill. App. 3d 630, 635-36, 439 N.E.2d 506, 510.) The IPTAB attempts to avoid waiver by arguing that this is a jurisdictional matter because plaintiffs have failed to comply with assessment challenging procedures.

Although filing a verified application is a prerequisite, express approval by the assessor is not a prerequisite. The IPTAB does not make a statutory construction argument to the effect that the legislature intended the approval by the assessor to be a jurisdictional step before the Board could consider an objection. For this court to put such an interpretation on section 20g—2 of the Act would lead to the absurd result of putting the responsibility on the tax objector to see to it that the assessor performs a statutorily mandated function in a reasonable time so that the objector is not at risk of missing the time limit for filing an objection to a property tax assessment. Courts presume that absurd consequences are not contemplated by the legislature. *McDunn v. Williams* (1993), 156 Ill. 2d 288, 309, 620 N.E.2d 385, 396.

The IPTAB also argues that the record does not disclose that the plaintiffs ever filed an application or some other objecting pleading with the Board to invoke the Board's jurisdiction. However, we do not find that fatal since the Board may, on its own motion, initiate proceedings to revise assessments. Ill. Rev. Stat. 1991, ch. 120, par. 588.

■ Finally, we consider whether the decision of the IPTAB was against the manifest weight of the evidence because an improper method of valuation of open space was employed. The IPTAB is required to decide the correct assessment of the subject property on the basis of the evidence received at the hearing. The burden of proving the assessment of the property to be excessive is on the objecting taxpayer. The proof must be by clear and convincing evidence. (*Kankakee County Board of Review v. Property Tax Appeal Board* (1989), 131 Ill. 2d 1, 22, 544 N.E.2d 762, 771; *La Grange Bank #1713 v. Du Page County Board of Review* (1979), 79 Ill. App. 3d 474, 480-81, 398 N.E.2d 992, 998.) Under the Administrative Review Law, judicial review extends to all questions of law and fact presented by the record. (Ill. Rev. Stat. 1991, ch. 110, par. 3—110.) An agency's findings on questions of law, such as the interpretation of a statute, are not binding on the courts. When a question of law is presented below, the reviewing court considers the question *de novo*. (*Board of*

*Education of Du Page High School District No. 88 v. Illinois Educational Labor Relations Board* (1992), 246 Ill. App. 3d 967, 973-74, 617 N.E.2d 790, 794.) However, the agency's findings of fact will not be disturbed on review unless they are against the manifest weight of the evidence. *Envirite Corp. v. Illinois Environmental Protection Agency* (1994), 158 Ill. 2d 210, 214; *DiFoggio v. Retirement Board of the County Employees Annuity & Benefit Fund* (1993), 156 Ill. 2d 377, 380-81, 620 N.E.2d 1070, 1072.

Plaintiffs contend the instant case involves a determination of whether an improper method of valuation was employed, a question of law, instead of whether there was a difference of opinion as to the fair cash value of the subject property, a question of fact. (*Kankakee County*, 131 Ill. 2d at 14, 544 N.E.2d at 768.) However, in this case both parties tried to demonstrate the fair cash value of the property through evidence of sales of arguably comparable property. The method used by both parties in this case, the market approach, is one of the generally accepted methods for determining the fair cash value of real estate. (See *Lake County Board of Review v. Property Tax Appeal Board* (1988), 172 Ill. App. 3d 851, 853, 527 N.E.2d 84, 85 (referring to the cost approach, the income approach, and the market approach).) In its decision, the IPTAB stated that the issue before it was "the correct value of the golf courses as open space." Even though when facts are undisputed a question of law is created and the agency's findings are not binding on the courts (*Kensington Steel Corp. v. Industrial Comm'n* (1944), 385 Ill. 504, 509, 53 N.E.2d 395, 397), in the case at bar, there is dispute over the fair cash value of the subject properties. The IPTAB had to assess the credibility of the witnesses and resolve the conflicts in the evidence. Therefore, a question of fact based on the difference of opinion of the fair cash value is the issue here.

The findings of the agency are *prima facie* true and correct (Ill. Rev. Stat. 1991, ch. 110, par. 3—110), and the courts of review do not reassess witness credibility, reweigh the evidence, or make an independent determination of the facts. (*Farmers State Bank v. Department of Employment Security* (1991), 216 Ill. App. 3d 633, 639, 576 N.E.2d 532, 537; *Dharmavaram v. Department of Professional Regulation* (1991), 216 Ill. App. 3d 514, 526-27, 576 N.E.2d 361, 369-70.) A decision of the agency is against the manifest weight of the evidence if the opposite conclusion is clearly evident or its findings are unreasonable, arbitrary, and not based upon any of the evidence. (See *Maple v. Gustafson* (1992), 151 Ill. 2d 445, 454, 603 N.E.2d 508, 512-13.) If there is any evidence which fairly supports the agency's findings, the decision must be sustained on review. *Farmers State*

*Bank*, 219 Ill. App. 3d at 640, 576 N.E.2d at 537; *Dharmavaram*, 216 Ill. App. 3d at 527, 576 N.E.2d at 370.

Ordinarily, for the purpose of assessment under the Act, real property is valued at its fair cash value, meaning the amount the property would bring at a voluntary sale where the owner is ready, willing, and able to sell; the buyer is ready, willing, and able to buy; and neither is under a compulsion to do so. (*In re Application of Rosewell* (1983), 120 Ill. App. 3d 369, 373, 458 N.E.2d 121, 125.) The terms "fair cash value" and "fair market value" are synonymous. (*Lake County Board of Review v. Property Tax Appeal Board* (1989), 192 Ill. App. 3d 605, 615, 548 N.E.2d 1129, 1136.) Section 20g—1 is an exception to the general rule that property is valued at its fair cash value. (*Lake County Board of Review*, 192 Ill. App. 3d at 615, 548 N.E.2d at 1136.) Section 20g—1 of the Act states:

"Except in counties with a population of 200,000 or more which classify real property for the purpose of taxation, in addition to valuation as otherwise permitted by law, upon the filing of an application under Section 20g—2 by the person liable for the taxes on that land, land which is used for open space purposes and has been so used for the 3 years immediately preceding the year in which the assessment is made shall be valued on the basis of its fair cash value, estimated at the price it would bring at a fair, voluntary sale for use by the buyer for open space purposes.

Land is used for open space purposes within the meaning of this Section if it is more than 10 acres in area and is used actually and exclusively for maintaining or enhancing natural or scenic resources, protects air or streams or water supplies, promotes conservation of soil, wetlands, beaches, or marshes, including ground cover or planted perennial grasses, trees and shrubs and other natural perennial growth trees and shrubs, and including any body of water, whether man-made or natural, conserves landscaped areas, such as public or private golf courses, enhances the value to the public of abutting or neighboring parks, forests, wildlife preserves, nature reservations, sanctuaries, or other open spaces, or preserves historic sites. Land is not used for open space purposes within the meaning of this Section if it is used primarily for residential purposes." Ill. Rev. Stat. 1991, ch. 120, par. 501g—1.

Plaintiffs have cited several cases which discuss rules of statutory construction. The issue raised in this appeal does not require a resort to statutory construction. Section 20g—1 of the Act is not ambiguous. (*Lake County Board of Review*, 192 Ill. App. 3d at 618, 548 N.E.2d at 1138.) The statute defines open space. A golf course is open space under the statute. The statute also says the assessment of such land is to be "its fair cash value, estimated at the price it would bring at a

fair, voluntary sale for *use by the buyer for open space purposes.*" (Emphasis added.) Ill. Rev. Stat. 1991, ch. 120, par. 501g—1.

The parties in this case attempted to place into evidence testimony about comparable sales. "Comparable" is defined as:

> "1: capable of being compared: a: having enough like character-istics or qualities to make comparison appropriate \*\*\* b: permit-ting or inviting comparison often in one or two salient points \*\*\* 2: suitable for matching, coordinating, or contrasting: Equivalent, Similar \*\*\* syn see LIKE" (Webster's Third International Dictio-nary 461 (1986)).

The definition indicates that dissimilarities as well as similarities be-tween the properties are to be considered in determining the fair cash value of the subject property. (*Department of Public Works & Buildings v. Chicago Title & Trust Co.* (1950), 408 Ill. 41, 53, 95 N.E.2d 903, 909-10; *Department of Public Works & Buildings v. Lankford* (1965), 65 Ill. App. 2d 133, 137, 212 N.E.2d 14, 16.) Whether a sale is or is not comparable goes to its relevancy and the weight to be accorded that evidence at the hearing. (*Department of Public Works*, 65 Ill. App. 2d at 137, 212 N.E.2d at 16.) It is not a question of methodology for valuing the property.

In the instant case, none of the properties used as comparables by either expert were "open space." The defendants' expert testified to land transactions which involved acquisitions for the purpose of developing a golf course. There was no testimony that any of that land was open space as defined in section 20g—1 before the transac-tions. A golf course has been designated as open space under section 20g—1. Open space valuation and the value of property as a golf course *per se* are unrelated, the value of the property as open space being incidental to the land's use as a golf course and not the reason for the purchase of the land.

In *Knox County Board of Review v. Illinois Property Tax Appeal Board* (1989), 185 Ill. App. 3d 530, 534-35, 541 N.E.2d 794, 796-97, the appellate court upheld an IPTAB determination that the value of the subject golf course as open space did not include the value of ground improvements such as tees and greens. See also *Lake County Board of Review*, 192 Ill. App. 3d at 618-19, 548 N.E.2d at 1137-38.

In Black's Law Dictionary, "open space" is defined as "Any parcel or area of land or water essentially unimproved and set aside, dedicated, designated or reserved for public or private use or enjoyment or for the use and enjoyment of owners and occupants of land adjoining or neighboring such open spaces." (Black's Law Dictio-nary 984 (5th ed. 1979).) Of course, some unimproved land does have a higher fair cash value than other unimproved land, and it is not

always the lowest valued property in the county as plaintiffs' expert assumed.

In this case, the properties Skilbeck relied on were properties which were not open space prior to the transaction and which were purchased for use as golf courses, an open space use. The weakness in this evidence is that farmland or vacant residential or commercial property may have a value different than open space even if the buyer intends to convert the land to an open space use. Nevertheless, the IPTAB could reasonably determine that the comparable sales placed into evidence by the Board were more comparable to open space valuation than was the evidence offered by plaintiffs and that plaintiffs failed to carry their burden of proof. See *Kankakee County*, 131 Ill. 2d at 22, 544 N.E.2d at 771; *La Grange Bank*, 79 Ill. App. 3d at 481, 398 N.E.2d at 998.

The properties High testified about may have been unimproved or partially unimproved land prior to the sale, but there was no testimony that they were maintained as open space prior to the sale or that the buyers purchased the properties for the purpose of maintaining them as open space. There was no evidence that any of the land referred to by High was ever purchased for open space purposes, or used for such purposes. High's testimony was such that the IPTAB could find him less credible.

The most comparable sale would involve current open space sold to be maintained as open space. That may require a statewide search. It would seem that the Sangamon County State's Attorney's Office understood well what to look for. Even the sale of an existing golf course for use as a golf course would be considered by some as not setting the value for "open space." (See *Lake County Board of Review*, 192 Ill. App. 3d at 619, 548 N.E.2d at 1138; Chipman, *Illinois's Open Space Statute: An Administrative Review of the "Country Club Tax Relief Act*," J. of Prop. Tax Mgmt. 40, 45 (1991).) The value of open space really depends on the "price" society puts on such use of land. If society values open space highly, open space land will have a high fair cash value by comparison to other uses. Property currently set aside for a more valuable purpose, even though vacant, would probably result in a higher asking price even if the buyer intended to utilize the property as open space. Indeed, under the statute, the property must be open space for three years before the tax advantage comes into play. It would therefore seem that sales of land currently used for other purposes and intended to be used as a golf course are not as comparable as the Board here suggests. One would expect there would be a premium paid because of the nature of the land's current use, the suitability of the land as a golf course as opposed to

wetlands or forest, and proximity to a population center which would promote use of the land as a golf course and may provide competition for the acquisition of the land for a use other than as a golf course. Therefore, the price paid for land to be used as a golf course may not always be the best evidence of the value of open space.

However, since plaintiffs failed to present evidence of comparable sales involving the fair, voluntary sale of land for use by a buyer for open space purposes, plaintiffs have failed to carry their burden of proof. The determination of the fair cash value of the subject property by the IPTAB was not against the manifest weight of the evidence.

For the foregoing reasons, the judgment of the circuit court of Sangamon County is affirmed.

Affirmed.

STEIGMANN, J., concurs.

JUSTICE GREEN, specially concurring:

I concur in the decision to affirm. Section 20g—1 of the Act describes land used for "public or private golf courses" as land used for "open space purposes" and requires it be valued "at the price it would bring at a fair, voluntary sale for use by the buyer for open space purposes." (Ill. Rev. Stat. 1991, ch. 120, par. 501g—1.) Obviously, not all "open space purposes" land is intended to have the same value nor the same per-acre value. A golf course is intended to be assessed at a value higher than most swamps.

The clear intent of the Act is for the instant properties to be assessed for their value as golf courses under circumstances whereby the properties could not be used for any non-"open space" purpose such as a subdivision. The Board came close to doing this and the decision of the IPTAB did not produce an assessment that was too high.